DECISION
Appellant Loans for Residential Homes Mortgage Corp. ("Loans for Homes") appeals from a decision of the Rhode Island Department of Labor and Training ("DLT"), awarding William H. Murphy, a former employee of Loans for Homes, unpaid wages pursuant to G.L. 1956 § 28-14-19. Loans for Homes seeks to have the DLT's decision reversed or remanded for further proceedings. This Court has jurisdiction pursuant to G.L. 1956 § 42-35-15. For the reasons set forth below, this Court affirms the DLT decision and denies the appeal.
 FACTS AND TRAVEL
On May 12, 2005, the DLT conducted a hearing pursuant to § 28-14-19 in response to a complaint filed by Mr. Murphy on or about November 10, 2003. Mr. Murphy alleged in his complaint that Loans for Homes failed to pay wages totaling $ 1,872.20. The Hearing Officer heard testimony and received evidence from Mr. Murphy and from Karim Menebhi, President of Loans for Homes, and Gregory W. Westwater, the company's Compliance Officer. *Page 2 
At the hearing, Mr. Murphy testified that he began working for Loans for Homes on or about December 31, 2002 as a loan originator. (Tr. 4.) He received a biweekly base salary of $ 400.00, plus commissions from fees collected on loans that he worked on and had closed. (Tr. 4.) Mr. Murphy alleged that he worked continuously for Loans for Homes until September 2003, when he informed the company that he was not going to make any additional phone calls or originate any new loans. (Tr. 4, 6.) When hired by Loans for Homes, he received a copy of the company's employment manual, which set forth the policies and procedures regarding commission employees. (Tr. 5.) Mr. Murphy stated that when he finally ceased working for Loans for Homes, the company owed him one mortgage commission valued at $ 1,872.20. (Tr. 7-8.) At the time of the hearing, Loans for Homes had not paid him the alleged commission. (Tr. 7-8.)
Mr. Murphy claimed that Loans for Homes owed him the commission because he worked directly with the borrower through the closing of the loan on or about September 8, 2003. (Tr. 8.) He made numerous telephone calls to both the borrower and the appraiser of the property and kept in regular contact with Loans for Homes since he no longer worked in their offices. (Tr. 8.) According to Mr. Murphy, he stopped working in the company offices on August 19, 2003, but did not end his employment until sometime in September 2003. (Tr. 11.) However, he handled all questions and conditions involving the loan and the property appraisal, and he worked with a Loans for Homes loan processor to close the loan. (Tr. 9-10, 18.) Due to his work on the mortgage, Loans for *Page 3 
Homes collected a fee totaling $ 9,734.00. (Tr. 16.) Mr. Murphy argued that he should have received twenty percent of this fee, i.e. $ 1,872.20.[1]
In support of his complaint, Mr. Murphy submitted the following documents into evidence:
 1. a copy of the Loans for Homes employment manual involving commissions;
 2. a cell phone bill noting calls to the borrower and the property appraiser;
 3. a Loans for Homes Commission Sheet for the loan at issue, noting a Total Fee Income of $ 9,734.00;
 4. the Department of Housing and Urban Development ("HUD") Settlement Statement for the loan;
 5. a letter from the borrower indicating the amount of time spent discussing the loan with Mr. Murphy, as well as the unavailability of another Loans for Homes employee, Louis St. Germain, who allegedly handled the loan after Mr. Murphy ended his employment; and
 6. a letter from another employee of Loans for Homes, indicating that Mr. Murphy met with Mr. St. Germain in early October 2003 about obtaining his commission check.[2] *Page 4 
The Hearing Officer next heard testimony from Mr. Menebhi. Mr. Menebhi testified that Mr. Murphy resigned his employment on August 19, 2003. (Tr. 22.) According to Mr. Menebhi, Mr. Murphy took a vacation from August 11 to August 18 and never returned to work. (Tr. 22.) Since Mr. Murphy left before the closing of the loan, Mr. St. Germain monitored the loan conditions. (Tr. 23.) Moreover, Mr. St. Germain closed the loan on September 8, 2003 — approximately three weeks after Mr. Murphy's resignation and received the commission payment. (Tr. 23, 25.) By choosing to quit on August 19 — before the loan was clear to close — Mr. Murphy was not entitled to a commission on that loan. (Tr. 23.) However, Mr. Murphy did receive commissions on other loans that cleared to close or closed while still employed by Loans for Homes: one on August 18 and the other on August 20. (Tr. 25-26.) The record does not clearly indicate whether Mr. Murphy cleared to close or closed two loans or three loans immediately prior to his alleged resignation on August 19, not counting the loan at issue in this case. (Compare Tr. 26with Tr. 24.)
In the loan commission at issue, Mr. Menebhi claimed that Mr. St. Germain handled any remaining appraisal issues and title matters and obtained the insurance binder. (Tr. 27-28.) According to Mr. Menebhi, company policy does not allow splitting commissions when an employee resigns before the closing of a loan. (Tr. 28-29.) Additionally, Mr. Westwater testified that the Commission Sheet submitted by Mr. Murphy is a non-binding, internal company document. (Tr. 30.) According to Mr. Westwater, Loans for Homes determines fees based on the HUD Settlement Statement. *Page 5 
(Tr. 30.) To support their claim that Mr. Murphy resigned on August 19, 2003, Loans for Homes submitted payroll records into evidence.
In response, Mr. Murphy asserted that the yield spread portion of the fee totaling $ 5,100.00 did not appear on the HUD Settlement Statement. (Tr. 34.) This amount plus the $ 4,634.00 origination fee resulted in total fees of $ 9734.00 as claimed by Mr. Murphy. Loans for Homes did not dispute this figure for the total fees collected. (Tr. 43.) Additionally, Mr. Murphy claimed that he worked both in the Loans for Homes offices and at home after August 19 and that he had no official termination date for his employment. (Tr. 36-37.) He testified that he continued to work on the loan at issue after August 19 and discussed the matter with Mr. St. Germain. (Tr. 42-43.)
In light of this conflicting testimony, the Hearing Officer relied primarily on the documents submitted into evidence in making his decision. He found that Mr. Murphy's cell phone statement indicated that Mr. Murphy made calls to phone numbers he identified as belonging to the borrower and the appraisers at least until September 5, 2003, but not through the loan's closing date. He also determined that the letter from the borrower indicated that Mr. Murphy performed certain services leading up to the closing, but no dates that would establish whether the services occurred through the loan's cleared-to-close or closing dates. Additionally, the Hearing Officer observed that the letter from Mr. Murphy's co-worker does not indicate the termination date of Mr. Murphy's employment.
However, the Hearing Officer noted that the payroll records submitted by Loans for Homes indicate that the company paid three checks to Mr. Murphy on August 28, 2003, September 11, 2003, and October 23, 2003. The Hearing Officer considered these *Page 6 
payments unusual, because an employee who resigned on August 19, 2003 would normally not continue to receive payroll checks into October 2003. According to the Hearing Officer, Loans for Homes presented no testimony or evidence to explain this occurrence. Thus, the Hearing Officer concluded that Mr. Murphy remained an employee of Loans for Homes through September 2003.
In his decision, the Hearing Officer held that Loans for Homes owed Mr. Murphy a commission on the loan at issue for work he performed on behalf of Loans for Homes while still an employee. Based on his findings of fact and pursuant to § 28-14-19, the Hearing Officer determined that Loans for Homes owed Mr. Murphy unpaid gross wages in the amount of $ 1,872.20, less any standard deductions. Additionally, the Hearing Officer ordered Loans for Homes to pay the DLT a twenty-five percent penalty totaling $ 468.05.
On July 14, 2005, Loans for Homes filed a timely appeal with the Rhode Island Superior Court pursuant to § 42-35-15.
 STANDARD OF REVIEW
The Superior Court of Rhode Island reviews contested agency decisions pursuant to the provisions of the Rhode Island Administrative Procedures Act, § 42-35-15(g). Section 42-35-15(g) provides that:
 [t]he court shall not substitute its judgment for that of the agency as to the weight of the evidence on the questions of fact. The court may affirm a decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency; *Page 7 
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in light of reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
In reviewing an agency decision, this Court will not weigh the evidence upon which findings of fact are based, but will limit itself to an examination of the certified record in deciding whether the agency had substantial evidence to support its decision. Ctr. for BehavioralHealth, Rhode Island, Inc. v. Barros, 710 A.2d 680, 684 (R.I. 1998). The Rhode Island Supreme Court has defined "substantial evidence" as "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance." Foster-Glocester Reg'l Sch. Comm. v. Bd. ofReview, Dep't of Labor Training, 854 A.2d 1008, 1012 (R.I. 2004) (citing R.I. Temps, Inc. v. Dep't of Labor and Training, Bd. ofReview, 749 A.2d 1121, 1124 (R.I. 2000)). Moreover, this Court will not substitute its judgment for that of an agency as to the weight of the evidence on questions of fact, even if this Court "might be inclined to view the evidence differently and draw inferences different from those of the agency." Johnston Ambulatory Surgical Assocs. v. Nolan,755 A.2d 799, 805 (R.I. 2000) (quoting Rhode Island Pub. Telecomm. Auth. v. RhodeIsland State Labor Relations Bd., 650 A.2d 479, 485 (R.I. 1994)). Therefore, this Court may reverse findings of fact only where the factual conclusions of an administrative agency are "totally devoid of competent evidentiary support in the record." Baker v. Dep't ofEmployment and Training Bd. Of Review, 637 A.2d 360, 363 (R.I. 1994) (quoting *Page 8 Milardo v. Coastal Res. Mgmt. Council, 434 A.2d 266, 272 (R.I. 1981)).
 ANALYSIS
Loans for Homes bases the instant appeal on a question of fact. The company alleges that the DLT Hearing Officer erroneously concluded that Mr. Murphy continued his employment through the loan's September 8, 2003 closing date. The Hearing Officer found that three payroll checks dated August 28, 2003, September 11, 2003, and October 23, 2003 indicate that Loans for Homes employed Mr. Murphy through the closing date. Loans for Homes contends that these checks constituted payments on commissions for three loans that Mr. Murphy closed or cleared to close before his alleged resignation on August 19, 2003. According to Loans for Homes, Mr. Murphy did not continue his employment at Loans for Homes through the close of the loan at issue and only received checks for commissions on loans already closed. Therefore, Loans for Homes argues that the Hearing Officer committed a clear error by basing his decision on the dates of the three checks.
In response, the DLT maintains that the Hearing Officer properly assessed the credibility of the witnesses and the validity of the documents admitted into evidence. The DLT urges this Court to accept the Hearing Officer's finding that the payroll checks indicate Mr. Murphy's continued employment through September 2003. According to the DLT, the Hearing Officer made findings of fact based on the evidence in the record, and these findings were not arbitrary, capricious, or affected by error of law. Thus, the DLT argues that this Court should uphold the Hearing Officer's administrative decision.
Pursuant to the Administrative Procedures Act, this Court's review of administrative decisions "is confined to a determination of whether there is any legally *Page 9 
competent evidence to support the agency's decision." Tierney v. Dep'tof Human Servs., 793 A.2d 210, 212 (R.I. 2002) (quoting Envtl.Scientific Corp. v. Durfee, 621 A.2d 200, 208 (R.I. 1993)). Moreover, this Court will not substitute its judgment for that of the agency concerning the credibility of witnesses or the weight of the evidence concerning questions of fact. Id. at 213 (citing Technic, Inc. v. R.I.Dep't of Employment and Training, 669 A.2d 1156, 1158 (R.I. 1996)). Thus, this Court may reverse factual conclusions of administrative agencies "only when they are totally devoid of competent evidentiary support in the record." Baker, 637 A.2d at 363 (quotingMilardo, 434 A.2d at 272).
The hearing transcript evidences that neither Mr. Menebhi nor Mr. Westwater affirmatively stated that the three checks entered into evidence constituted three payments on loan commissions. Indeed, Mr. Menebhi later testified that Loans for Homes owed Mr. Murphy commissions for two loans, rather than three loans. (Compare Tr. 24 with Tr. 26.) Loans for Homes did not submit documentary evidence at the hearing to support its contention that the three paychecks resulted solely from commissions on loans closed or cleared to close before August 19, 2003. This Court also notes that in addition to commissions received, the three paychecks also include gross payments to Mr. Murphy. On two of the paychecks, dated August 28, 2003 and September 11, 2003, Mr. Murphy received gross payments of $ 400.00, the exact amount of his biweekly base salary. Furthermore, the paystub dated October 23, 2003 indicates that Mr. Murphy received no payments on commissions, only gross salary totaling $ 1,172.21. *Page 10 
In the instant appeal, this Court finds that the Hearing Officer conducted a thorough examination of the documentary evidence submitted by both parties. Although Loans for Homes contends that the three paychecks at issue resulted solely from commissions due to Mr. Murphy before his alleged resignation on August 19, the documents before the Hearing Officer indicate that Mr. Murphy received gross salary in addition to commissions. This Court finds that the Hearing Officer relied on legally competent evidence in deciding that Mr. Murphy remained an employee of Loans for Homes at least through the end of September 2003. In light of the testimony and documents presented at the administrative hearing, the record in this case was far from devoid of competent evidence supporting the Hearing Officer's decision. It is well settled that "the Superior Court may not, on questions of fact, substitute its judgment for that of the agency whose action is under review." Johnston Ambulatory Surgical Assocs., 755 A.2d at 805 (quotingR.I. Pub. Telecomms. Auth., 650 A.2d at 485). Therefore, the Hearing Officer did not render an arbitrary, capricious, or clearly erroneous decision.
 CONCLUSION
After thoroughly reviewing the entire record, this Court holds that the DLT Hearing Officer based his decision and recommendation on reliable, probative, and substantial evidence in the record. Thus, the Appellant's substantial rights have not been prejudiced. For the reasons stated above, this Court affirms the DLT decision finding that Loans for Homes owes Mr. Murphy unpaid gross wages in the amount of $ 1,872.20, less the standard deductions. This Court also finds the DLT decision to order Loans for Homes to pay the DLT a twenty-five percent penalty totaling $ 468.05 did not constitute an abuse of discretion. Counsel shall prepare an appropriate judgment for entry.
[1] This Court notes that twenty percent of $ 9,734.00 is $ 1,946.80, not $ 1,872.20 as claimed by Mr. Murphy. For reasons unknown to this Court, Mr. Murphy only sought the lesser amount. Therefore, this Court will base its analysis of the appeal on the amount claimed by Mr. Murphy.
[2] The Hearing Officer did not mark any of these documents for identification. Although the Hearing Officer refers to all these documents as evidence, neither the transcript nor the documents themselves evince whether the Hearing Officer properly admitted them into evidence. Because none of the parties has questioned the admissibility of the evidence presented at the administrative hearing, this Court will give these documents due consideration in rendering this decision. See DePasquale v. Harrington, 599 A.2d 314, 317 (R.I. 1991) (holding that "an expert administrative tribunal concerned with advancing the public welfare should not be rigidly governed by rules of evidence designed for juries").